# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  April 08, 2014

Mr. William J. Cole
Ms. Jennifer S. M. Croskey
Ohio Attorney General
30 E. Broad Street, 26th Floor
Columbus, OH 43215

Mr. Paul M. Sherman
Ms. Erica J. Smith
Institute for Justice
901 N. Glebe Road, Suite 900
Arlington, VA 22203

Mr. Timothy M. Sandefur
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814

Mr. Maurice Aaron Thompson
1851 Center for Constitutional Law
208 E. State Street
Columbus, OH 43215

Mr. Curt C. Hartman
3478 Fox Point Court
Amelia, OH 45102

Re:  Case No. 13-3012, *Liberty Coins, et al v. David Goodman, et al*
Originating Case No. : 2:12-cv-00998

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. John P. Hehman

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0064p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LIBERTY COINS, LLC; JOHN MICHAEL TOMASO,

*Plaintiffs-Appellees,*

*v.*

No. 13-3012

DAVID GOODMAN, Director, Ohio Department of Commerce; AMANDA MCCARTNEY, Consumer Finance Attorney, Division of Financial Institutions, Ohio Department of Commerce,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus
No. 2:12-cv-00998—Michael H. Watson, District Judge.

Argued: October 11, 2013

Decided and Filed: April 8, 2014

Before: MERRITT and CLAY, Circuit Judges; and STAFFORD, District Judge.[*]

───────────────

## COUNSEL

**ARGUED:** William J. Cole, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. Maurice A. Thompson, 1851 CENTER FOR CONSTITUTIONAL LAW, Columbus, Ohio, for Appellees. **ON BRIEF:** William J. Cole, Jennifer S. M. Croskey, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. Maurice A. Thompson, 1851 CENTER FOR CONSTITUTIONAL LAW, Columbus, Ohio, Curt C. Hartman, THE LAW FIRM OF CURT C. HARTMAN, Amelia, Ohio, for Appellees. Timothy Sandefur, PACIFIC LEGAL FOUNDATION, Sacramento, California, Paul M. Sherman, Erica Smith, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Amici Curiae.

───────────────

[*]The Honorable William H. Stafford, Jr., United States District Judge for the Northern District of Florida, sitting by designation.

1

---

## OPINION

---

CLAY, Circuit Judge.  Defendants, David Goodman, Director of the Ohio Department of Commerce, and Amanda McCartney, Consumer Finance Attorney of the Division of Financial Institutions, Ohio Department of Commerce, are charged with enforcement of the Ohio Precious Metals Dealers Act ("PMDA"), Ohio Revised Code § 4728.  They appeal from an order entered by the United States District Court for the Southern District of Ohio, Eastern Division, granting Plaintiffs' motion for a preliminary injunction, which was later modified in a separate order. Finding that Plaintiffs were likely to succeed on the merits of their facial First Amendment commercial speech claim at trial, the district court issued a preliminary injunction prohibiting enforcement of the PMDA.  We disagree with the district court's interpretation of the Ohio statute, and, for the reasons that follow, we **REVERSE** the district court's order granting a preliminary injunction, and **REMAND** for further proceedings consistent with this opinion.

# I.
# BACKGROUND

## A.    Procedural History

Plaintiffs, Liberty Coins, LLC, and John Michael Tomaso, filed a complaint in district court pursuant to 42 U.S.C. § 1983 facially challenging the constitutionality of the PMDA, Ohio Revised Code § 4728.  In their complaint for declaratory and injunctive relief, claiming they would suffer irreparable harm if a preliminary injunction were not issued, Plaintiffs allege that the PMDA (1) facially violates the First Amendment commercial speech rights of businesses dealing in precious metals throughout the state of Ohio; (2) is void for vagueness; and (3) violates the Fourth Amendment rights of businesses through what they claim are overly burdensome retention, reporting, and record-keeping requirements.  *See* Ohio Rev. Code Ann. § 4728.06–08 (West 2014).

After a hearing held within two weeks after the filing of the complaint, the district court granted a preliminary injunction based on a finding that the PMDA facially violates the First Amendment of the United States Constitution because only those engaged in commercial speech are subject to the statute's licensing requirement; therefore, the district court found, Plaintiffs are likely to succeed on the merits of their First Amendment claim at trial.  Under this preliminary injunction, the Consumer Finance Division of the Ohio Department of Commerce may not enforce the PMDA's licensing provision and therefore may not require that businesses dealing in non-exempt precious metals obtain licenses or fine those, like Plaintiffs, who previously violated the statute.  Defendants sought a modification of the preliminary injunction based on whether a portion of the PMDA could be severed from the statute as a whole.  The district court granted the modification in part and denied it in part.

Following that decision, Defendants timely appealed the district court's order granting the preliminary injunction and sought a stay of the enforcement of the preliminary injunction from the district court.  The motion for a stay of the preliminary injunction pending appeal was denied by a three-judge panel of this Court.  Reviewing the district court's preliminary injunction order for an abuse of discretion, the panel found that "[t]he district court's conclusion that the PMDA regulates commercial speech has some support in the case law, but is not dictated by precedent." *Liberty Coins v. Goodman*, No. 13-3012, slip op. at 2 (6th Cir. Mar. 26, 2013) (order denying stay of preliminary injunction pending appeal).  Therefore, the panel held, it was not an abuse of the district court's discretion to grant a preliminary injunction where the law is not yet established on the issue presented.  The preliminary injunction remains in force today.

Plaintiffs' requests for permanent injunctive relief based on the First Amendment and for temporary, preliminary, and permanent injunctive relief under the Fourth Amendment remain pending before the district court.  Therefore, this Court is only charged in this appeal with deciding whether a preliminary injunction is proper on a facial First Amendment challenge of the constitutionality of the PMDA.

**B.      Factual Background**

Plaintiffs are John Michael Tomaso and Liberty Coins, LLC, an Ohio Limited Liability Company with its principal place of business and storefront in Delaware County, Ohio.  Tomaso owns and operates Liberty Coins, which buys, sells, and trades silver and gold jewelry, hallmark bars, ingots, numismatics, and other related items.  Liberty Coins advertises its goods and services through a number of means, including a storefront and signage, newspaper advertisements, and business card distribution.  These various forms of advertisements indicate that the business buys, sells, and trades gold and silver items.

Since 1921, the state of Ohio has, in some form, prohibited businesses from engaging in the purchasing of precious metals without a license.  As Defendants assert in this case, the Ohio legislature sought to regulate businesses potentially dealing in stolen goods.  The statute in question states that except as otherwise provided, "no person shall act as a precious metals dealer without first having obtained a license from the division of financial institutions in the department of commerce."  Ohio Rev. Code Ann. § 4728.02 (West 2014).  Once licensed, each individual or entity

> shall keep and use books and forms approved by the superintendent of financial institutions, which shall disclose, at the time of each purchase, a full and accurate description including identifying letters of marks thereon of the articles purchased, with the name, age, place of residence, driver's or commercial driver's license number or other personal identification, and a short physical description of the person of the seller.  The licensee also shall write in the book the name of the maker.

Ohio Rev. Code Ann. § 4728.06 (West 2014).  Additionally, the licensee "shall keep the books in numerical order at all times at the licensed location, open to the inspection of the . . . head of the local police department [or others charged with such authority].  Upon demand . . . the licensee shall produce and show an article thus listed and described."  *Id.*  Each licensee must also make available "a description of all articles received by the licensee on the business day immediately preceding, together with the number of the receipt issued."  Ohio Rev. Code Ann. § 4728.07 (West 2014).

In addition to the statute's reporting and record-keeping requirements, licensed precious metals dealers must comply with additional requirements. For example, "[n]o person licensed under [the PMDA] shall purchase any articles from any minor, or from any person intoxicated or under the influence of a controlled substance, from any person who is known or believed by the licensee to be a thief, or a receiver of stolen property." Ohio Rev. Code Ann. § 4728.08 (West 2014). Once the licensee purchases precious metals, the PMDA requires that the licensee retain those articles for at least "five days after the date of purchase." Ohio Rev. Code Ann. § 4728.09(A) (West 2014). Thereafter, if the head of the local police department has probable cause to believe that an item listed in the licensee's daily reports has been stolen, he will notify the licensee, who must retain the item for thirty days, unless otherwise notified by the local police department. Ohio Rev. Code Ann. § 4728.09(B) (West 2014). Any person who fails to comply with the PMDA's requirements is subject to civil action by injured parties. Additionally, dealers who fail to comply with the PMDA's provisions are guilty of a misdemeanor for the first offense and a felony of the fifth degree for each subsequent offense, and they are fined accordingly. Ohio Rev. Code Ann. § 4728.99 (West 2014).

The PMDA's requirements apply to any party that holds itself out to the public as willing to purchase precious metals. In 1982, the Ohio General Assembly amended the Ohio Pawnbroker Act (Ohio Revised Code Chapter 4727) to more clearly define "precious metals dealer," and in 1986, this definition was separated out into the newly enacted Precious Metals Dealers Act (Ohio Revised Code Chapter 4728). This version of the statute defined a precious metals dealer as "a person who is engaged in the business of purchasing articles made of or containing gold, silver, platinum, or other precious metals or jewels of any description if, in any manner, including any form of advertisement or solicitation of customers, he holds himself out to the public as willing to purchase such articles." 1986 Ohio Legis. Serv. Ann. 5-963 (West). The statute was subsequently altered to include female and gender-neutral pronouns.[1] Currently, under the statute, any individual or business that formally holds itself out to the public through

---

[1] The current version of the PMDA defines a precious metals dealer as "a person who is engaged in the business of purchasing articles made of or containing . . . precious metals or jewels of any description if, in any manner, including any form of advertisement or solicitation of customers, the person holds himself, herself, or itself out to the public as willing to purchase such articles." Ohio Rev. Code Ann. § 4728.01 (West 2014).

advertisement, solicitation, or other means, must have a license before operating its business.  To obtain a license, a precious metals dealer must disclose personal, professional, and financial information to the State and demonstrate good character and good reputation.  Ohio Rev. Code Ann. § 4728.03(A), (B) (West 2014).  The statute states, "[T]he department of commerce may grant a precious metals dealer's license to any person of good character, having experience and fitness in the capacity involved, who demonstrates a net worth of at least ten thousand dollars and the ability to maintain that net worth during the licensure period."  Ohio Rev. Code Ann. § 4728.03(B)(1) (West 2014).

Pursuant to the PMDA, the State has continued to prohibit unlicensed precious metals dealers from formally purchasing non-exempt precious metals from the public and has recently ramped up enforcement efforts under the statute.

In August 2012, Brian Landis ("Landis"), the Chief Examiner of the Consumer Finance Division of the Ohio Department of Commerce, reviewed an anonymous letter directing his attention to Tomaso and Liberty Coins.  After reviewing this letter, Landis visited Liberty Coins on August 24, 2012.  He documented this visit by taking photographs of the store front and the inside of the store.  The photographs were specifically targeted at the store's signage, which announced to the public that Liberty Coins was open for business and listed the services and goods that were available inside the store.  Landis indicated to Tomaso that Liberty Coins was operating as a precious metals dealer in violation of the PMDA and that Plaintiffs must comply with the statute, otherwise they would face fines and criminal charges.  Plaintiffs were given until September 7, 2012, to comply with the order.

After Plaintiffs failed to respond, Landis transferred the case to Defendant Amanda McCartney in the Ohio Department of Commerce's legal department sometime around September 24, 2012.  A few days later, around October 1, 2012, McCartney sent a letter to Plaintiff Tomaso stating as follows: "Liberty Coins has held itself out to the public as willing to purchase precious metals via signage at the store location."  Due to that activity, McCartney stated, Liberty Coins had violated the PMDA by operating as a precious metals dealer without a license.  Additionally, the letter pointed out that Tomaso had failed to respond to the Division of Financial Institutions' inquiry into the violation.  The letter gave Liberty Coins twenty-one days

to produce business records that would "demonstrate the amount of precious metal [the] business ha[d] purchased from the public over the last twelve (12) months." This would allow Defendants to assess a proper fine consistent with the amount of unlicensed business conducted by Plaintiffs during the period of noncompliance. The letter also advised that if Plaintiffs did not respond to the letter, they might face a cease and desist order and a fine of up to $10,000. Additionally, Plaintiffs' failure to respond could reflect negatively on a future license application.

Tomaso responded to McCartney's letter sometime around October 17, 2012, requesting clarification of her demands. One of the questions Tomaso posed in his letter was whether Liberty Coins could continue to operate the business consistent with the PMDA's requirements if all advertising was removed from the building and other forms of business solicitation ceased. McCartney indicated in response that "[s]imply ceasing advertising [would] not eliminate the need for a license [and c]easing precious metals business in its entirety [was] the only way [to] forego the need for a license." She later stated in an email that Plaintiffs "cannot buy any gold or silver without a license. [They] must cease all illegal activities immediately as each violation is subject to a $10,000 fine and criminal sanctions [under the PMDA]." While their motion for a preliminary injunction was pending, Plaintiffs ceased all advertising and purchasing of non-exempt gold and silver, consistent with McCartney's directives.

## II.

## DISCUSSION

In this appeal, Defendants challenge the district court's finding that there is a strong likelihood Plaintiffs will prevail on their facial challenge of the PMDA's constitutionality at trial. Because the district court has not yet ruled on Plaintiffs' requests for permanent injunctive relief based on the First Amendment or their claims regarding the Fourth Amendment, this Court does not address those issues.[2]

---

[2]In its opinion granting the preliminary injunction, the district court stated that "[b]ecause the Court finds Plaintiffs are likely to prevail on a facial challenge to the Act, the Court does not consider whether the Act has been unconstitutionally applied to Plaintiffs in particular or whether Plaintiffs have standing to bring such a claim." *Liberty Coins v. Goodman*, No. 2:12-cv-998, 2012 WL 9335828, at *2 (S.D. Ohio Dec. 5, 2012).

### A.        Standard of Review

Plaintiffs assert that the proper standard of review in this case is for abuse of discretion. "It is well settled that the scope of review on appeal from the denial or granting of a preliminary injunction is limited to a determination of whether the District Court abused its discretion." *Mason County Medical Ass'n v. Knebel*, 563 F.2d 256, 260–61 (6th Cir. 1977). Under such a standard, "[t]he district court's determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (internal quotation marks omitted). In deciding issues related to whether the district court erred in its factual determinations, this Court applies an abuse of discretion standard. It is the province of the district court to view and weigh the evidence, and an appellate court should only disturb the district court's conclusions as to the sufficiency of evidence presented by Defendants if its decision was clearly erroneous. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

However, "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). In such a case, the likelihood of success on the merits is a legal question and there is little dispute of the facts in the record. *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007). "Because the 'determination of whether the movant is likely to succeed on the merits is a question of law and is accordingly reviewed de novo,' the standard of review for a district court decision regarding a preliminary injunction with First Amendment implications is de novo." *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007)).

The main issues presented on appeal in the instant case are questions of law, potentially implicating the First Amendment. Therefore, this Court reviews *de novo* the district court's application of the law and ultimate decision to grant a preliminary injunction.

## B.          Standard for Issuing a Preliminary Injunction

When determining the appropriateness of a preliminary injunction, a court must examine four factors. First, the court must determine "whether the plaintiff has established a substantial likelihood or probability of success on the merits" of his claim. *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010) (internal quotation marks omitted). Second, the court will determine "whether the [plaintiff] would suffer irreparable injury" if a preliminary injunction did not issue. *Bays*, 668 F.3d at 818–19 (citing *Tenke Corp.*, 511 F.3d at 542). Third, the court determines "whether the injunction would cause substantial harm to others." *Id.* at 819. And finally, a court must consider "whether the public interest would be served" if the court were to grant the requested injunction. *Id.*

Each of these factors "[should] be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Leary*, 228 F.3d at 736. In the context of a First Amendment claim, the balancing of these factors is skewed toward an emphasis on the first factor. As this Circuit has previously stated,

> When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor. With regard to the factor of irreparable injury, for example, it is well-settled that "loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury."

*Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). In cases implicating the First Amendment, the other three factors often hinge on this first factor. "[T]he determination of where the public interest lies [] is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 288 (internal quotation marks omitted). Similarly, "because the questions of harm to the parties and the public interest generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the crucial inquiry often is, and will be in this case, whether the statute at issue is likely to be found constitutional." *Id.* (citing *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991)). Therefore, as Plaintiffs have asserted a deprivation of the First Amendment right to

free speech, this Court's emphasis is on Plaintiffs' likelihood of success on the merits. Because this Court neither agrees with the district court's interpretation of the PMDA nor believes Plaintiffs have a strong likelihood of prevailing on their First Amendment claim at trial, we find that the district court erred in granting a preliminary injunction halting enforcement of the PMDA.

## C.        Likelihood of Success on the Merits

### 1.        Facial Challenge

This Court has before it a facial challenge of the PMDA. Generally, the party asserting a facial challenge to a statute must establish that "no set of circumstances exists under which [it] would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987). However, "[w]here a plaintiff makes a facial challenge under the First Amendment to a statute's constitutionality, the 'facial challenge' is an 'overbreadth challenge.'" *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) (quoting *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc)). Therefore, "[i]nstead of having to prove that *no* circumstances exist in which the enforcement of the statute would be constitutional, the plaintiff bears a lesser burden: to demonstrate that a substantial number of instances exist in which the law cannot be applied constitutionally." *Id.* (internal quotation marks omitted); *see also New York State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988) ("To succeed in its challenge, appellant must demonstrate from the text of [the law] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally.").[3]

### 2.        The PMDA is a Valid Regulation of Business

The PMDA is, first and foremost, a licensing statute. It is a statute calculated to regulate individuals and entities that hold themselves out to the public as willing to purchase precious metals. Each subsection of the statute is tailored to achieve this goal. The manner by which the state of Ohio defines a precious metals dealer is meant to distinguish between those who operate

---

[3]We have not found it necessary, in this opinion, to address the issue of whether the law and the facts of this case would accommodate an as-applied challenge, and leave that issue for another day.

as businesses that are open to the public and those who make isolated, casual precious metals purchases.

Ohio's method of regulating precious metals dealers is not unique.  In fact, numerous other states have enacted business regulations that contain similar language.  In North Carolina, for example, a statute regulating cash converters defines a currency converter as "[a] person engaged in the business of purchasing goods from the public for cash at a permanently located retail store who holds himself or herself out to the public by signs, advertising, or other methods as engaging in that business."  N.C. Gen. Stat. Ann. § 66-387 (West 2013).[4]  Nebraska has also implemented a licensing scheme that controls individuals who hold themselves out to the public as engaging in their respective professions.  Through its Cosmetology, Electrology, Esthetics, Nail Technology, and Body Art Practice Act, Nebraska has made it unlawful for any unlicensed person or entity "[t]o operate or advertise or hold oneself out as operating a cosmetology establishment in which any of the practices of cosmetology or the teaching of any of the practices of cosmetology are carried out."  Neb. Rev. Stat. § 38-1058 (2013).  Arkansas regulates geologists in a similar manner.  In Arkansas, "[i]t shall be unlawful for any person to publicly practice geology . . . in th[e] state or to use in connection with his or her name, or otherwise assume, or advertise, any title or description tending to convey the impression that he or she is a registered geologist unless the person has been registered or exempted [under the statute]."  Ark. Code Ann. § 17-32-301(a) (West 2014).[5]

---

[4]North Carolina also regulates its precious metals dealers in a similar manner, defining a precious metals dealer as "a person who purchases precious metals from the public . . . and holds himself or herself out to the public by signs, advertising, or other methods as engaging in such purchases."  N.C. Gen. Stat. Ann. § 66-406 (West 2013).

[5]For additional examples of regulatory statutes, *see, e.g.,* Ga. Code Ann. § 7-7-1 (West 2013) (defining a mortgage broker as one who "in the regular course of business . . . [h]olds himself out as being able to make mortgage loans . . . [or] buy or sell mortgage loans"); N.Y. Arts & Cult. Aff. Law § 60.01 (McKinney 2014) (defining a sports collectibles dealer as "a person who is in the business of selling . . . or a person who by his occupation holds himself out as having knowledge or skill peculiar to such collectibles"); Mo. Ann. Stat. § 400.2-104 (West 2014) (defining a merchant in Missouri as a "person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction"); Minn. Stat. Ann. § 148.632 (West 2014) (exempting from Minnesota's dietitian and nutritionist licensing requirement individuals who train under registered dietitians and who "do[] not hold out as a dietitian or nutritionist unless so licensed"); Alaska Stat. Ann. § 08.06.180 (West 2013) (prohibiting those who are not properly licensed from "practic[ing] psychology or hold[ing] out publicly as a psychologist or as practicing psychology").

Like each of these statutes, the PMDA uses "holding oneself out" to distinguish between those who Defendants wish to regulate and those who should and must remain free from regulation by nature of the infrequency and informality of their precious metals transactions. The Nebraska legislature did not wish to regulate young girls who paint each others' nails at a slumber party and the Georgia legislature likely does not seek to regulate a parent who provides a loan for his child to purchase a home. *See* Neb. Rev. Stat. § 38-1058 (2013); Ga. Code Ann. § 7-7-1 (West 2013). Likewise, the Ohio General Assembly sought to distinguish between the typical person who casually stops at a garage sale "to engage in the business of purchasing" non-exempt articles and businesses with storefronts that have a presence in the community and formally announce to the public that they are open for business. The state of Ohio used its police power to regulate those individuals and entities by requiring that they obtain a license and comply with requirements placed on all licensed precious metals dealers. Plaintiffs missed the point of the statute when they argued before the district court that "the drafters could have easily dispensed with the promotional speech requirement altogether and written the PMDA to regulate 'any person who actually purchases metals.'" Had the drafters employed such language, the statute would have applied far too broadly, to those who make infrequent purchases in casual environments and do not hold themselves out to the public as willing to make such purchases. Instead, the State regulates those who have storefronts or otherwise indicate to the public that they are open for business, whether through signage, business cards, word of mouth, newspaper advertisements, conducting public transactions, or a large window to the street with precious metals displays.

### 3.     Business Regulation Subject to Rational Basis Review

Long ago, the Supreme Court recognized that "[t]he power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud." *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). This regulatory power is often exercised through the enactment of licensing statutes, as evidenced by the abbreviated list of state licensing schemes alluded to above. As Justice Jackson explained in his concurring opinion in *Thomas v. Collins*,

> The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money . . . . [T]he state may have an interest in shielding the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency. A usual method of performing this function is through a licensing system . . . . Very many are the interests which the state may protect against the practice of an occupation . . . .

323 U.S. 516, 545 (1945) (Jackson, J., concurring). As a result, where a regulatory scheme neither implicates a fundamental right nor creates a suspect classification, rational basis review applies.

The PMDA is just such a statute that neither burdens a fundamental right, nor creates a suspect classification. It merely constitutes a regulatory scheme meant to protect the safety and welfare of the public through the regulation of professional conduct. Rational basis review therefore applies. *See Doe. v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007).

In *Martinez v. Goddard*, 521 F.Supp.2d 1002 (D. Ariz. 2007), a federal district court in Arizona upheld the state's statutory licensing scheme regulating contractors in the construction industry. The regulation at issue required that any individuals wishing to engage in construction work obtain a license. *Id*. at 1004–05. The plaintiff, an unlicensed contractor, asserted that the statute improperly distinguished between licensed and unlicensed contractors, hindered his constitutional rights, and failed to achieve its purpose. Although this case was challenged on substantive due process and equal protection grounds, the test applied by the court applies here as well, where no fundamental constitutional right is at issue. The court applied rational basis review because the statute neither burdened a fundamental right nor created a suspect classification deserving of heightened scrutiny, and "the claims at issue in th[e] case [only] pertain[ed] to economic liberties." *Id*. at 1006. The district court upheld the statute because the regulatory scheme was rationally related to a legitimate state interest. *Id*. at 1009.[6]

---

[6] *See also Doe*, 490 F.3d at 501 (6th Cir. 2007) ("We evaluate statutes that do not implicate a plaintiff's fundamental rights by utilizing a rational-basis standard of review"); *Star Scientific Inc. v. Beales*, 278 F.3d 339 (4th Cir. 2002) (applying rational basis review to determine whether the economic legislation at issue was rationally related to a legitimate government interest); *Christy v. Hodel*, 857 F.2d 1324, 1331–32 (9th Cir. 1988) ("[I]n the area of economics and social welfare, the legislative classification satisfies requirements of equal protection if it has some 'reasonable basis' and if any state of facts can be conceived to justify it"); *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1050 (9th Cir. 2000) (quoting *City of New Orleans v.*

Similarly, in *Office of Prof'l Regulation v. McElroy*, 824 A.2d 567, 568 (Vt. 2003), the plaintiff, an unlicensed individual acting as a real estate broker in the state of Vermont, challenged the state's licensing scheme, asserting that although he was unlicensed, he had a First Amendment right to advertise properties as a real estate agent and that he could not be reprimanded for doing so without a license.  The court upheld the statute as a constitutional exercise of the State's police power.  The statute did not implicate protected First Amendment speech because "[h]e [was] not being restrained from publishing advertisements; he [was] being restrained from publishing misleading statements about his own status as a broker."  *Id.* at 571. The State could constitutionally prevent an unlicensed real estate broker from advertising houses and his availability as a broker.

To prevail under rational basis review, Defendants need only demonstrate that the statute's classification and the licensing requirement are rationally related to a legitimate government interest.  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010).  Generally, "[w]hen social or economic legislation is at issue [and a fundamental right is not implicated], the Equal Protection Clause allows the States wide latitude."  *Cleburne*, 473 U.S. at 440 (citing *United States R.R. Ret. Bd. of Fritz*, 449 U.S. 166, 174 (1980)).

> Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, [the Supreme Court's] decisions presume the constitutionality of the statutory discriminations and require only that the [statute] challenged be rationally related to a legitimate state interest.  States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude.

*City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976); s*ee also Ziss Bros. Constr. Co., v. City of Independence, Ohio*, 439 F. App'x 467, 476 (6th Cir. 2011) ("Government action subject to rational basis review will not be deemed to lack rational justification simply because it is not

---

*Dukes*, 427 U.S. 297, 303 (1976)) ("Because we conclude that the licensing scheme neither utilizes a suspect classification nor implicates a fundamental right, we now examine whether it is 'rationally related to a legitimate state interest.'").

made with mathematical nicety or because in practice it results in some inequality.") (internal quotation marks omitted).

Under rational basis review, a law is upheld so long as it is rationally related to a legitimate government purpose. There is a strong presumption of constitutionality and the regulation will be upheld so long as its goal is permissible and the means by which it is designed to achieve that goal are rational. *Nat'l Ass'n for Advancement of Psychoanalysis*, 228 F.3d at 1050. "This standard is highly deferential; courts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances." *Doe*, 490 F.3d at 501. "Under rational basis scrutiny, government action amounts to a constitutional violation only if it is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Michael v. Ghee*, 498 F.3d 372, 379 (6th Cir. 2007) (internal quotation marks omitted). Finally, under rational basis review, the government "has no obligation to produce evidence to sustain the rationality of its action; its choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.'" *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)).[7]

Plaintiffs are unlikely to prevail on the merits of their claim under rational basis review. Defendants asserted in their briefs that the Ohio legislature's purpose in enacting and subsequently amending and enforcing the PMDA was to protect consumers and the public from theft, fraud, money laundering, fencing, to restrict the flow of stolen goods, and to prevent terrorism. Even Plaintiffs concede that such a government purpose is legitimate, even compelling. *Liberty Coins v. Goodman*, No. 2:12–cv–998, 2012 WL 9335828, at *8 (S.D. Ohio Dec. 5, 2012).

The PMDA's licensing requirement is rationally related to that legitimate government purpose. The government need not present reams of evidence to prove that the regulation directly and materially advances the governmental purpose. *TriHealth*, 430 F.3d at 790. Instead,

---

[7] "This standard of review is 'a paradigm of judicial restraint,' growing out of recognition that 'equal protection is not a license for courts to judge the wisdom, fairness or logic of legislative choices.'" *TriHealth*, 430 F.3d at 791 (quoting *Beach Commc'ns*, 508 U.S. at 313–14).

there need only be some rational relationship between the government's purpose and the means the government has chosen to achieve that purpose. *Schweiker v. Wilson*, 450 U.S. 221, 235 (1981). Here, it was reasonable for the Ohio legislature to have distinguished between businesses that hold themselves out to the public as formally, frequently, or routinely dealing in precious metals and those who merely purchase precious metals informally, infrequently, and for their own personal use. The former are more likely to deal in large quantities of precious metals and move stolen goods through the marketplace. It was reasonable for the legislature to have believed that a licensing requirement and the close monitoring of those who are licensed would curtail the amount of stolen goods in the marketplace and aid the police in their attempt to recover stolen goods in a timely manner. Plaintiffs have not offered evidence to demonstrate that the PMDA is not a rational method for achieving the government's legitimate interest in protecting the public from theft or fraud. Therefore, under rational basis review, Plaintiffs are unlikely to prevail on the merits, and they are not entitled to a preliminary injunction in their favor.

**4.      The PMDA and the "Holding Out" Requirement**

Plaintiffs improperly assert and the district court improperly found that the PMDA burdens commercial speech and is therefore governed by the test laid out in *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980). Plaintiffs point to a number of cases in which courts have applied heightened scrutiny to strike down statutes regulating a profession while also directly burdening commercial speech. However, many of the cases relied on by Plaintiffs neither address nor even ask the question now before this Court: whether the statute regulates commercial speech or simply regulates economic activity. Additionally, these cases are distinguishable on their facts.

In the as-applied challenge in *Parker v. Commonwealth of Kentucky, Bd. of Dentistry*, 818 F.2d 504, 506 (6th Cir. 1987), this Court struck down a statute under which "a general practitioner [was] not prohibited from performing dental services in the area of specialization, [but was] prohibited . . . from holding himself out to the public as a specialist." Although the statute was meant to prevent the public from being misled by non-specialists' advertising, this Court deemed the statute an unconstitutional burden on speech: "If a state regulates speech

which is potentially misleading . . . 'the preferred remedy is more disclosure, rather than less.'" *Id*. at 509 (quoting *Bates v. State Bar of Arizona*, 433 U.S. 350, 375 (1977)).[8]   In *Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002), the Supreme Court dealt with a similar regulation in the context of prescription drugs.   The Food and Drug Administration Modernization Act ("FDAMA"), 111 Stat. 2328, 21 U.S.C. § 353a, allowed pharmacies to produce and sell compounded drugs without FDA approval.   However, once pharmacies elected to advertise the availability of those compounded drugs to the medical community and to the public at large, they were required to seek FDA approval.   The statute was designed to allow for small quantities of unapproved, experimental compounded drugs to enter the marketplace free from regulation.   *Id*. at 370–71.   Once pharmacies advertised the availability of compounded drugs, increasing the amount of experimental, unapproved drugs in the marketplace, the FDA approval requirement was triggered.   The Court struck down this provision of the statute as an unconstitutional burden on protected First Amendment commercial speech, finding that advertising was "the trigger for requiring FDA approval" and that the regulation did not pass constitutional muster under the *Central Hudson* test.   *Id*. at 370.

In both *Parker* and *Thompson*, the Courts applied the *Central Hudson* test without first determining whether the statute implicated protected commercial speech or economic interests.[9]

---

[8]*See also Abramson v. Gonzalez*, 949 F.2d 1567, 1570 (11th Cir. 1992) (holding that it is a violation of the First Amendment to allow an unlicensed individual to practice psychology or one of the related fields while prohibiting that person from "holding himself or herself out by any title or description incorporating [certain] words"); *Byrum v. Landreth*, 566 F.3d 442, 449 (5th Cir. 2009) (holding unconstitutional a regulation prohibiting certain forms of advertising by unlicensed individuals who are legally entitled to engage in interior design); *Roberts v. Farrell*, 630 F.Supp.2d 242, 255 (D. Conn. 2009) (holding unconstitutional a Connecticut statute preventing unlicensed interior designers from referring to themselves as "interior designers," but allowing them to lawfully perform interior design services without a license); *Wang v. Pataki*, 396 F.Supp.2d 446 (S.D.N.Y. 2005) (applying the *Central Hudson* test to New York's apartment information vendor law, which limited the information vendors could include in apartment advertisements).

[9]Plaintiffs also cite *Pagan v. Fruchey*, 492 F.3d 766 (6th Cir. 2007) (en banc), as support for their argument that the PMDA burdens commercial speech.   This case is unpersuasive as it, too, does not answer the question before this Court and is distinguishable by its facts.   In *Pagan*, this Court considered an as-applied challenge of the constitutionality of a municipal ordinance prohibiting residents from parking on public streets.   Although the defendants asserted that the parking ordinance merely regulated the conduct of parking, they conceded that the city was only concerned with the display of "For Sale" signs and only enforced the ordinance against those who engaged in this particular type of commercial speech, not against all residents who parked their cars on the side of the road.   Therefore, the Court did not engage in an analysis of whether the statute's language burdened commercial speech, instead finding that in that as-applied challenge, "even if [it] construed the literal language of [the subsection] as not implicating the First Amendment, Glendale concedes that it enforces the ordinance in a manner that does."   *Id*. at

In *Thompson*, for example, both of the parties "agree[d] that the advertising and soliciting prohibited by the FDAMA constitute[d] commercial speech," and the Court began its analysis by applying *Central Hudson* to determine whether the statute impermissibly regulated that commercial speech. 535 U.S. at 366. In *Parker*, too, this Court assumed that the statute in question regulated speech and only determined whether the speech was protected before proceeding to a *Central Hudson* analysis.[10] Therefore, these cases fail to provide much guidance for the parties in this case inasmuch as the business activity of Plaintiffs falls within the purview of the PMDA, the primary purpose of which is to regulate the conduct of precious metals dealers.

Additionally, these cases are distinguishable by their facts. Under the PMDA, any business holding itself out as willing to purchase non-exempt goods must be licensed, regardless of the way in which it holds itself out. Parties like Plaintiffs are not able to operate as businesses in the marketplace without a license. The PMDA does not require the infrequent garage sale-goer to obtain a license, but it does require any party that holds itself out to the public for the purpose of operating a precious metals business to obtain the required license. The statute proscribes business conduct and economic activity, not speech. Without first obtaining a license from the State, a precious metals dealer may not have a storefront with or without signage, may not spread word to the public that it is open for business, may not place advertisements in the newspaper, and may not function as an open, public, and visible business.

Although at first glance, the PMDA appears analogous to the FDAMA and the Kentucky statute regulating dentists, those cases are inapposite in this context. In *Thompson*, pharmacists legally produced compounded drugs but could not advertise them to the public. The statute did not proscribe any conduct unless a pharmacist advertised the compounded drug. In *Parker*, dentists could legally perform specialized procedures for the public but were unable to hold themselves out as available to do so. In the instant case, Plaintiffs and others similarly situated

---

772. In the instant case, Defendants do not concede that the PMDA is enforced in a manner that violates the First Amendment, and Plaintiffs have not carried their burden as they are required to do for a facial challenge by demonstrating that a substantial number of instances exist in which the PMDA is enforced in an unconstitutional manner. *New York State Club Ass'n*, 487 U.S. at 14.

[10] *See Parker*, 818 F.2d at 509 (explaining that "advertising which is false, misleading or deceptive, or which proposes an illegal transaction, is not protected by the First Amendment from state regulation.").

are *prohibited* from functioning as businesses open to the public for the purchase of precious metals unless they obtain licenses. The PMDA regulates all precious metals businesses operating in a manner that is open and accessible to the public. Precious metals dealers must obtain licenses and comply with the PMDA's reporting, retention, and record-keeping requirements, regardless of whether they advertise or post signage. In this case, the underlying conduct of the unlicensed precious metals dealer is prohibited, as distinguished from the cases cited by Plaintiffs.

The PMDA does not burden the commercial speech rights of unlicensed precious metals dealers because such dealers do not have a constitutional right to advertise or operate an unlicensed business that is not in compliance with the reasonable requirements of Ohio law. Such dealers cannot "hold themselves out" to the public without a license, regardless of whether they advertise. This case does not turn on advertising or solicitation, it turns on whether the business in question holds itself out to the public, which can occur by posting a sign, placing goods in an open window, simply conducting business in a manner that is visible to the public, or otherwise making its wares available to the public. This Court properly applies rational basis review in concluding that the statute does not violate Plaintiffs' First Amendment rights.

## D.    Other Preliminary Injunction Factors

### 1.    Irreparable Injury in the Absence of a Preliminary Injunction

Because this Court finds that Plaintiffs are not likely to succeed on the merits of their First Amendment claim at trial, this factor weighs against affirming the district court's order granting a preliminary injunction. Plaintiffs do not have a constitutional right to engage in the unlicensed business of precious metals dealing and they therefore do not have a First Amendment right to advertise that they engage in such business when they lack a license to do so. Although Plaintiffs and other similarly situated individuals and entities will have to obtain licenses to comply with the PMDA in the absence of a preliminary injunction, this burden does not rise to the level of a constitutional violation.

**2.      Substantial Harm to Others Caused by a Preliminary Injunction**

Additionally, because the PMDA constitutes a valid exercise of the State's police power, this factor weighs in favor of reversing the district court and vacating the preliminary injunction. If the government has a legitimate, and even compelling or substantial, interest in regulating precious metals dealers to protect the public from theft, fraud, money laundering, fencing, and even terrorism, as Plaintiffs concede, then the absence of such a regulation could cause substantial harm to others.    Although the district court found that Defendants presented insufficient evidence to demonstrate a proper "fit" between the PMDA's licensing requirement and the governmental interest, as required under *Central Hudson*, such a fit need not be demonstrated under rational basis review.  In the instant case, where it is reasonable for the Ohio legislature to have concluded that businesses dealing in potentially substantial quantities of precious metals are likely to move stolen items through the marketplace, the absence of such a licensing scheme could result in substantial harm to others.

**3.      Public Interest Not Served by a Preliminary Injunction**

Finally, under this last factor, because the PMDA constitutes a valid exercise of the State's police power and does not impermissibly burden a constitutional right, the issuance of a preliminary injunction fails to serve the public interest.  Instead, the public interest would be served by enforcement of the PMDA.

**III.**

**CONCLUSION**

For the foregoing reasons, we **REVERSE** the district court's order granting a preliminary injunction blocking enforcement of the PMDA, and **REMAND** for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 13-3012

LIBERTY COINS, LLC; JOHN MICHAEL TOMASO,
      Plaintiffs-Appellees,

**FILED**
*Apr 08, 2014*
DEBORAH S. HUNT, Clerk

    v.

DAVID GOODMAN, Director, Ohio Department of Commerce;
AMANDA MCCARTNEY, Consumer Finance Attorney,
Division of Financial Institutions, Ohio Department of Commerce,
      Defendants-Appellants.

Before: MERRITT and CLAY, Circuit Judges; STAFFORD, District Judge.

**JUDGMENT**

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the district court's judgment granting a preliminary injunction blocking enforcement of the state of Ohio's Precious Metals Dealers Act, Ohio Revised Code § 4728, is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion of this Court.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk