**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LIBERTY COINS, LLC,** | : | **Case No. 2:12-CV-00998** |
| | : | |
| **JOHN MICHAEL TOMASO,** | : | |
| | : | **Judge Watson** |
| **WORTHINGTON JEWELERS, LTD.,** | : | |
| | : | |
| **and** | : | **Magistrate Deavers** |
| | : | |
| **ROBERT CAPACE** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **FIRST AMENDED VERIFIED** |
| **ANDRE PORTER, in his official capacity as** | : | **COMPLAINT** |
| **Director, Ohio Department of Commerce,** | : | |
| | : | |
| **DAVID GOODMAN, in his official capacity as** | : | |
| **Director, Ohio Department of Commerce,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **AMANDA MCCARTNEY,  in her official capacity** | : | |
| **as Consumer Finance Attorney of Division of** | : | |
| **Financial Institutions, Ohio Department of** | : | |
| **Commerce,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

Now come Plaintiffs, LIBERTY COINS, LLC ("Liberty Coins"), JOHN MICHAEL TOMASO ("Mike Tomaso" or "Mr. Tomaso"), WORTHINGTON JEWELERS, LTD. ("WJ"), and ROBERT CAPACE ("MR. CAPACE")(collectively, the "Plaintiffs"), and for their Complaint against ANDRE PORTER, ("Mr. Porter"), DAVID GOODMAN ("Mr. Goodman"), and AMANDA MCCARTNEY ("Ms. McCartney") (collectively, the "Defendants"), allege as follows:

## INTRODUCTION

1.      This is an action brought pursuant to 42 U.S.C. §1983 for declaratory judgment, temporary restraining order, preliminary and permanent injunction, and nominal damages arising from the unconstitutional policies and practices of Defendants.  Defendants' policies, practices and custom, as well as certain conduct by one or more Defendants, Plaintiffs have suffered and will continue to suffer irreparable harm to their rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.  The harm may only be remedied by a ruling from this Court.

2.      Defendants have impeded and threaten to unconstitutionally impede Plaintiffs in their right to engage in protected advertisement and solicitation for their precious metals business, and their right to be free from unlimited warrantless searches without probable cause by maintaining, implementing and enforcing vague policies that (i) restrict and prohibit Plaintiffs and certain other Ohioans from engaging in protected commercial speech, (ii) impose significant criminal and administrative burdens on Plaintiffs and certain other Ohioans in response to their protected commercial speech, (iii) vest unfettered discretion in enforcement agents to restrict and burden commercial speech and conduct searches of private papers and property, (iv) threaten Plaintiffs and certain other Ohioans with subjection to unduly broad warrantless searches of their business property without probable cause; and (v) excessively levy fines on Plaintiffs and others, without due process of law or equal protection under the law.

3.      Additionally, Plaintiffs desire to engage in speech activities consistent with the purpose and goals of their business that are prohibited by the policies and practices of the Defendants even though the transactions proposed are exempt from the regulation of Defendants.

2

4.     As a result of the policy, practice and custom of the Defendants, as well as certain conduct by one or more Defendants, Plaintiffs have suffered and will continue to suffer irreparable harm unless the Defendants' policies and practices are enjoined.

## PARTIES

5.     Plaintiff Liberty Coins, LLC is an Ohio Limited Liability Company with its principal place of business in Delaware County, Ohio.

6.     Liberty Coins is in the business of buying, selling, and trading silver and gold coins, jewelry and other items, hallmark bars, ingots, and numismatics.  Plaintiff John Michael Tomaso, Jr. is the owner and operator of Liberty Coins, and is a resident of Delaware County, Ohio

7.      Mr.  Tomaso, who has over 35 years of experience in the field of gold and silver coins, wishes to continue on in this business, and further, to notify others that Liberty Coins engaged in this business.

8.     Plaintiff Worthington Jewelers ("WJ") is an Ohio limited liability company located at 692 High Street in Worthington, Ohio.

9.      Worthington Jewelers is in the business of buying, selling, and trading silver and gold coins, jewelry and other items, hallmark bars, ingots, and numismatics, since 2000, with a heavy emphasis on jewelry.

10.     WJ has operated both with and without a PMDA license over the past several years.

11.     Plaintiff Robert Capace is the owner and operator of Worthington Jewelers.

12.     Defendant David Goodman was previously the Director of the Ohio Department of Commerce ("DOC").  As Director, Mr. Goodman was the DOC's chief administrative and executive officer, and had oversight and authority over enforcement of the Ohio Precious Metals Dealers Act and Ohio Administrative Code regulations promulgated in putative support thereof.

13.     Defendant Andre Porter is the Director of the Ohio Department of Commerce ("DOC").  As Director, Mr. Porter is the DOC's chief administrative and executive officer, and has oversight and authority

over enforcement of the Ohio Precious Metals Dealers Act and Ohio Administrative Code regulations promulgated in putative support thereof.

14.     Defendant Amanda McCartney has been at all times relevant to the facts at issue in this case, the "Consumer Finance Attorney" with the Ohio Department of Commerce's Division of Financial Institutions that has taken and threatened enforcement action against Plaintiffs, putatively pursuant to the Ohio Precious Metals Dealers Act (the "Act").   Based upon information and belief, Ms. McCartney , as part of her official duties and responsibilities with the DOC, implements and/or implemented and enforces and/or enforced the unconstitutional restrictions accomplished through the DOC's policies and practices (as described herein).

15.     Defendants have confirmed that all PMDA enforcement actions of Amanda McCartney have been consistent with Department of Commerce PMDA enforcement policy.

16.     All actions by the Defendants described herein were undertaken under color of state law which caused the deprivation of Plaintiffs' rights protected by the United States Constitution.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as this action arises under the First, Fourth, and Fourteenth Amendments to the United States Constitution; under 28 U.S.C. § 1343(a)(3), in that it is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; under 28 U.S.C. § 1343(a)(4), in that it seeks to recover damages and secure equitable relief under an Act of Congress, specifically, 42 U.S.C. § 1983, which provides a cause of action for the protection of civil and constitutional rights; under 28 U.S.C. § 2201(a), to secure declaratory relief; under 28 U.S.C. § 2202, to secure preliminary and injunctive relief and damages; and under 42 U.S.C. § 1988, to award attorneys fees.

18.     Venue is proper within this judicial district and division pursuant to 28 U.S.C. § 1391(b) and Local Rule 82.1, as (i) the Defendants are situated within this judicial district and division; and (ii) all of the claims asserted by Plaintiffs arose within this judicial district and division.

## FACTUAL ALLEGATIONS

19.     Liberty Coins is in the business of buying, selling, and trading silver and gold coins, jewelry and other items, hallmark bars, ingots, and numismatics.  Liberty Coins maintains a single storefront retail location on West Central Avenue, a main street through Delaware, Ohio.

20.     Mike Tomaso, the owner of Liberty Coins, has over 35 years of experience in the field of gold and silver coins, and wishes to continue on in this business, and, in so doing, to notify or apprize others that Liberty Coins engages in this business.

21.     In the alternative, Mr. Tomaso wishes to continue his purchase, trade, and sale of gold and silver coins, hallmark bars, ingots, numismatics, and currency, and advertising associated therewith.

22.     Heretofore, Liberty Coins has advertised its business through limited means:  (1) a sign in its store window; (2) a free-standing sign just outside of the retail location; (3) several newspaper advertisements; and (4) business cards distributed by Mr. Tomaso when he comes into contact with current and prospective clients.[1]  These advertisements indicate that Liberty Coins buys, sells, and trades gold and silver, with an emphasis on coins and "scrap."  "Scrap" is an industry term referring to gold and silver that is valuable primarily due to its gold and silver content, to the extent that its highest value is to be melted down and reconstituted.

23.     An advertisement or solicitation indicating "[w]e buy gold and silver" is a truthful method of advertising for the purchase of gold and silver items that are exempt under the Act, such as gold and silver hallmark bars, coins, ingots, and numismatics, because each of these items consists of gold and silver.

24.     A majority of Liberty Coins' purchases, as well as the value of total purchases, consists of items that may contain gold and silver, but are nevertheless exempt under the Act.

25.     Prior to 2012, Worthington Jewelers had never maintained a precious metal dealers license.

26.     WJ maintained a PMDA license from approximately November of 2012 through November 2013.

---

[1]     See October 18, 2012 Letter of Ohio Dept. of Commerce Consumer Finance Attorney Amanda McCartney.

27. WJ permitted that PMDA license to expire in response to this Court's Preliminary Injunction enjoining the PMDA licensure requirement.

## The Ohio Precious Metals Dealers Act's Speech and Search Policies

28. Although enacted in 1983, the Ohio Precious Metals Dealers Act, codified in R.C. 4728, has been largely unenforced since its inception, and consequently, has never been challenged.

29. According to Defendants, in 2011 and 2012, the Ohio Department of Commerce ramped up enforcement efforts, resulting in submission of threatening letters and fines to numerous Ohio coin and precious metals dealers.[2]

30. Rather than solely regulating Ohio coin dealers on the basis of their *conduct*, Defendants' policies abridged protected commercial speech by (1) prohibiting protected speech without a license; and (2) imposing formidable burdens only upon businesses and individuals who engage in protected speech.

31. R.C. 4728.02(A) dictates that "no person shall act as a precious metals dealer without first having obtained a license from the division of financial institutions in the department of commerce."

32. In turn, one is only held to "act as a precious metal dealer," and therefore subject to the numerous burdens of the Act, if and only if he engages in speech protected by the First Amendment: "Precious metals dealer" means a person who is engaged in the business of purchasing articles made of or containing gold, silver, platinum, or other precious metals or jewels of any description if, in any manner, including any form of advertisement or solicitation of customers, the person holds himself, herself, or itself out to the public as willing to purchase such articles." R.C. 4728.01(A).

33. Pursuant to Defendants' policies, purchasers of valuables that are not subject to the Act, such as gold and silver coins, hallmark bars, ingots, and numismatics, are, absent the acquisition of a license and submission to its significant burdens, prohibited from truthfully advertising their interest in purchasing these products.

---

[2] See Ohio Department of Commerce "Enforcement Actions" by month, last checked on October 29, 2012, available at http://www.com.ohio.gov/fiin/enforcement.aspx.
The months of June, July, and August show a significant number of fines under the PMDA.

34.     R.C. 4728.05(A) subjects PMDA licensees to arbitrary and plenary government investigation, for the purposes of which, the state shall have "free access to books and papers * * * and other sources of information."

35.     R.C. 4728.05(B) subjects those who advertise to "at any time" and for any reason, compelled attendance for depositions and compelled production of all books, records, and documents.

36.     R.C. 4728.06 subjects those with a PMDA license to the requirements of (1) keeping government-approved books and forms; (2) compelled disclosure of each and every item purchased and physical description of the seller of each such item; (3) keeping one's books "in order" and "open to inspection" at all times; and (4) making available to the local police department, on each and every business day, a comprehensive list of every item purchased by the business.

37.     In addition, the Department of Commerce has promulgated OAC 1301:8-6-03 "Books and records."  Division (D) of that section indicates "Inspection of books and records: All books, forms, and records, and all other sources of information with regard to the business of the licensee, shall at all times be available for inspection by the division for the purpose of assuring that the business of the licensee is being transacted in accordance with law. * * * All books, forms, records, etc., shall be kept at the licensed location.

38.      Further, the Act, as applied to Plaintiffs by Defendants, prohibits speech by those who buy and sell precious metals, unless they first obtain a license.

39.     Defendants' policies and/or the PMDA forces Plaintiffs to choose between (1) operating their businesses; and (2) sacrificing their Fourth Amendment rights.

40.     When one operates without a license or violates any term of that license, he is subject to criminal sanction - - engaging in such speech is a misdemeanor of the first degree, punishable by imprisonment.[3]

41.     Plaintiffs now refuse to subject themselves to unconstitutional searches and fines through obtaining a PMDA license.

---

[3]      R.C. 4728.99.

## Defendants' Application and Enforcement of the Act against Plaintiffs

### *Liberty Coins*

42. On October 1, 2012, Ms. McCartney issued a threatening letter to Liberty Coins and Mr. Tomaso.[4] (A true and accurate copy of this letter is attached as Exhibit A to the original Complaint).

43. The letter indicates and/or asserts that (1) DOC's "Division of Financial Institutions visited Liberty Coins and discussed violations of [the Act];" (2) "Liberty Coins has held itself out to the public as willing to purchase precious metals via signage at the store location;" and (3) "Based upon the language of the PMDA, the Division has evidence that your business has violated the PMDA."[5]

44. In her letter, Ms. McCartney then orders Liberty Coins to "produce business records" so as to "enable the Division to determine a fine amount consistent with settlements made for similar violations of the law."[6]

45. This letter concludes that "[i]f you fail to respond to this letter, the Division may issue a cease and desist order that imposes a fine of up to $10,000," and "continued violation of the PMDA may reflect negatively upon the good character and fitness the division must find in order to issue a PMDA license to your business."[7]

46. Mr. Tomaso requested clarification, via email, on October 17, 2012. And in an October 18, 2012 email response to Mr. Tomaso, DOC indicated and/or asserted that Mr. Tomaso had engaged in prohibited speech through (1) a "We Buy Gold" sign in his store window; (2) a "freestanding sign outside [his] store's door" indicating "Buying Gold & Silver;" (3) Mr. Tomaso's Liberty Coins business card, which states, aside from the name, location, hours and website, "American and Foreign Coins and Currency," above "Gold and Silver Scrap" above "Buy-Sell-Trade-Appraisals-Estates" above "35 years professional

---

[4] See October 1, 2012 Letter to Liberty Coins from Amanda McCartney, Consumer Finance Attorney, Division of Financial Institutions.
[5] Id.
[6] Id.
[7] Id.

experience in numismatics;"[8] (4) the statement in an August 22, 2012 Delaware Gazette news story by a newspaper reporter for the Delaware Gazette, on a largely unrelated topic, briefly describing "Tomaso's shop and all others who purchase, sell, exchange or receive second-hand article containing precious metals or jewels. . ."; and (5) a "newspaper advertisement" in the Delaware Gazette classified section indicating that Liberty Coins is "paying top competitive prices for gold and silver. . . Buying American and Foreign Coins and Currency . . . Buy-Sell-Trade-Singles-Collections-Estates… Professional Numismatist for 35 years."[9]

47.     As Ms. McCartney declared in her email, the DOC maintains that *each* of these modes of protected speech are separate "violations [that] can impose a fine and is a first degree misdemeanor for the first offense and a fifth degree felony for each subsequent offense."[10]

48.     The next day, on October 19, DOC indicated to Mr. Tomaso that, as a result of his advertising, "you cannot buy any gold or silver without a license.  You must cease all illegal activities immediately, as *each* violation is subject to a $10,000 fine and criminal sanctions."[11]

49.     This government mandate from DOC and/or Ms. McCartney transcends even the plain language of the law, which allows for the purchase of gold and silver coins, ingots, hallmark bars, and numismatic items without a license, and also allows for the purchase of gold and silver from other dealers, so long as the purchaser does not engage in protected speech.

50.     Moreover, Ms. McCartney's email states "Simply ceasing advertising does not eliminate the need for a license.  Ceasing precious metal business in its entirety is the only way to forego the need for a license."[12]

51.     The foregoing statement appears at variance with the Act itself, which requires licensure only "if, in any manner, including any form of advertisement or solicitation of customers, the person holds

---

[8]     See business card of Liberty Coins.
[9]     October 18 Email from Liberty Coins from Amanda McCartney, Consumer Finance Attorney, Division of Financial Institutions; see also photocopy of August 22, 2012 Delaware Gazette Advertisement.
[10]     Id., response to question 3, referencing response to question 2.
[11]     October 19, 2012 Email from Liberty Coins from Amanda McCartney, Consumer Finance Attorney, Division of Financial Institutions.  Emphasis in original.
[12]     Id.

himself, herself, or itself out to the public as willing to purchase such articles,"[13] and apparently reflects the policies of the DOC and/or Ms. McCartney.

52.    As a result of Defendants' threats, Mr. Tomaso stopped all advertising for Liberty Coins in September 2012.  Shortly thereafter, also in response to Defendants' threats, Mr. Tomaso stopped all purchases of gold and silver items.

53.    Liberty Coins today operates in a state of paralysis, subject to unlawful criminal sanction if it continues to speak, subject to unlawful warrantless intrusions if it obtains a license, and subject to destruction of its business if it does neither.

### *Worthington Jewelers*

54.    In 2012, WJ received a threatening letter from Defendants indicating that it was required to obtain a PMDA license, required to cease and desist its business and advertising until it obtained such a license, and further required to pay a fine as a pre-condition to obtaining such a license.

55.    On or about October 9, 2012, in response to Defendants' threat(s), WJ applied for a PMDA license.

56.    WJ was not permitted to purchase gold from 10/19 through 11/13.

57.     WJ purchased $132,376 during the month of September 2012 and $67,355 from 10/1 through 10/18/2012.

58.    WJ estimates that it forewent approximately $132,000 in gold purchases during this time period.

59.    WJ also discontinued certain key advertising associated with precious metals during this time.

60.    Defendants initially demanded $150,000 from WJ as a fine for purchasing precious metals and holding itself out as willing to purchase precious metals without previously holding a PMDA license.

---

[13]    R.C. 4728.01(A).

61.     Defendants' $150,000 demand was also a condition precedent to its receipt of a PMDA license.

62.     On or about November 8, 2012, with WJ's application "still pending," WJ entered into a "Settlement Agreement" drafted by Defendants.

63.     WJ was required to sign the Settlement Agreement to obtain the PMDA license necessary to (1) advertise; and (2) continue its business.

64.     Paragraph J of the Settlement Agreement indicates "Because Applicant violated R.C. 4728.02(A), [Defendants] could have found that Applicant does not satisfy the good character requirement for licensure set forth in R.C. 4728.03(B)(1) and the application [sic] have been denied."

65.     Through the Settlement Agreement, Defendants fined WJ $12,500 for putatively violating the PMDA.

66.     Through the Settlement Agreement, Defendants demanded $12,500 as a condition precedent of its receipt of a PMDA license.

67.     Paragraph 5 of the "Agreed Conditions" further indicates that if WJ did not pay $12,500 to Defendants, Defendants maintained the option of denying WJ's PMDA application.

68.     Defendants used the ambiguity of the "good character" requirement in R.C. 4728.03(B)(1) to coerce WJ into, amongst other things, paying Defendants $12,500.

69.     Other precious metal dealers similarly situated to WJ paid fines, whether as a condition of licensing or otherwise, that were significantly lower than the fine paid by WJ - - as low as $100.00.

**Litigation related to the PMDA**

70.     In October of 2012, Plaintiffs Liberty Coins and Tomaso brought this action to enjoin the PMDA.

71.     On December 5, 2012, this Court enjoined the PMDA as facially unconstitutional on the grounds that it abridged protected commercial speech.

72.     This Court noted in its December 5, 2012 Preliminary Injunction Order that it did not need to reach the as-applied issue(s), given its finding that the PMDA was facially invalid (In its opinion granting the preliminary injunction, the district court stated that "[b]ecause the Court finds Plaintiffs are likely to prevail on a facial challenge to the Act, the Court does not consider whether the Act has been unconstitutionally applied to Plaintiffs in particular").

73.     Defendants appealed this Court's December 5, 2012 Order.

74.     The Sixth Circuit Court of Appeals, in Footnote 3 of its opinion in this case, states "We have not found it necessary, in this opinion, to address the issue of whether the law and the facts of this case would accommodate an as-applied challenge, and leave that issue for another day."[14]

75.     The United States Supreme Court refused Plaintiffs' Cert. Petition on January 12, 2015, rendering Defendants as prevailing on Plaintiffs' facial First Amendment challenge to the PMDA.

## DECLARATORY JUDGMENT AND INJUNCTION
### (28 U.S.C. § 2201, *et seq.*)

76.     Plaintiffs hereby incorporate by reference the allegations in the foregoing paragraphs as if set forth fully herein.

77.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning Plaintiffs' rights under the United States Constitution.  A judicial declaration is necessary and appropriate at this time as to all Counts.

78.     A state actor is liable under § 1983 if it took "action pursuant to official policy of some nature [that] caused a constitutional tort."[15]

79.     " [Governmental] liability may be imposed for a single decision by [government] policy makers under appropriate circumstances. " *Id.* at 480.

80.     Threatened deprivation of constitutional rights that chills speech is a First Amendment harm.[16]

---

[14]     *Liberty Coins v. Goodman,* 748 F.3d 682 (6th Cir. 2014).
[15]     *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

81.     The Supreme Court has clearly expressed that "the threat of burdensome litigation" can "serve as a deterrent and chill protected speech."[17]

82.     A state actor cannot constitutionally condition the receipt of a benefit, such as a permit to do business, on an agreement to refrain from exercising one's constitutional rights, especially one's right to free expression and one's right to be free from unlimited warrantless searches of private property, papers, and effects without probable cause.[18]

83.     Plaintiffs desire a judicial determination of their rights against Defendants as they pertain to Plaintiffs' right to express through advertisement, solicitation, and other public and private communications, the content that they are willing and able to purchase various gold and silver items, without being subjected to regulations that are not content neutral, not narrowly tailored to serve a substantial government interest, and do not leave open ample alternative channels of communication, and further, as they pertain to Plaintiffs' right to be free from unlawful searches, excessive fines, and vague speech licensing requirements.

84.     To prevent further violation of Plaintiffs' constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment be issued, pursuant to 28 U.S.C. § 2201 and FED. R. CIV. P. 57, declaring unconstitutional all relevant portions of the Ohio Precious Metals Dealers Act, Ohio Administrative Code, and Defendants enforcement policies, practices, and actions.

85.     Furthermore, pursuant to 28 U.S.C. § 2202 and FED. R. CIV. P. 65, it is appropriate and hereby requested that this Court issue preliminary and permanent injunctions prohibiting the Defendants from enforcing their search policies and restrictions on Plaintiffs' expressive activities to the extent they are unconstitutional, in order to prevent the ongoing violation of Plaintiffs' constitutional rights.

---

[16]     *United Food & Commercial Workers Local 1099 v. City of Sidney,* 364 F.3d 738 (6th Cir. 2004).
[17]     *Wisconsin Right to Life.* at 468–70, 127 S.Ct. 2652.
[18]     Id., citing *Perry v. Sindermann,* 408 U.S. 593, 597, (1972) ("For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."); *Keyishian v. Board of Regents,* 385 U.S. 589, 606, (1967) (quoting *Sherbert v. Verner,* 374 U.S. 398, 404, (1963)) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.").

**COUNT I**

**VIOLATION OF RIGHT TO FREE SPEECH UNDER**
**THE FIRST AND FOURTEENTH AMENDMENTS**
**TO THE UNITED STATES CONSTITUTION, AS APPLIED TO PLAINTIFFS**
**(42 U.S.C. § 1983)**

86.     Plaintiffs hereby incorporate by reference the allegations in the foregoing paragraphs as if set forth fully herein.

87.     Plaintiffs continue to desire to advertise "we buy gold" to elicit the purchase of items exempt from regulation pursuant to R.C. 4728.

88.     At all times relevant to the allegations in this Complaint, each and all of the acts alleged herein were attributed to one or more of the Defendants acting under the color, authority, and pretense of state law, statutes, ordinances, regulations, customs, usages, and policies of the State of Ohio and/or the Ohio Department of Commerce.

89.     Plaintiffs have engaged in and desire to engage in commercial speech which is not misleading, and which is protected by the First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment.

90.     "[S]igns, it is clear, represent a medium of expression that the Free Speech Clause has long protected." [19]

91.     Promotional activity is to be analyzed as commercial speech. [20]

92.     The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation. [21]

93.     The Supreme Court has outlined a four-part test that subjects restrictions on commercial speech to a form of intermediate scrutiny. [22]

---

[19]    *Prime Media, Inc. v. City of Brentwood, Tenn.,* 398 F.3d 814, 818 (6th Cir.2005).
[20]    *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 67, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983).
[21]    *Virginia Pharmacy Board*, 425 U.S., at 761-762, 96 S.Ct. at 1825.
[22]    *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 100 S.Ct. 2343 (1980).

94.     A restriction on protected commercial speech will be upheld only if the government "assert[s] a substantial interest in support of its regulation," "demonstrate[s] that the restriction on commercial speech directly and materially advances that interest[,]" and draws the regulation narrowly.[23]

95.     Put another way by the Sixth Circuit in *Bench Billboard v. City of Toledo*, "[f]or commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether [(2)] the asserted governmental interest is substantial. If both inquiries yield positive answers, we must [(3)] determine whether the regulation directly advances the governmental interest asserted, and [(4)] whether it is not more extensive than is necessary to serve that interest."

96.     Further, the Supreme Court has declined to uphold regulations that only indirectly advance the state interest involved.

97.     The State cannot regulate speech that poses no danger to the asserted state interest, nor can it completely suppress information when narrower restrictions on expression would serve its interest as well.

98.     Ohio's interests here, *at most,* consist of (1) Preventing theft and the temptation to steal; (2) apprehending thieves and recovering stolen property; and (3) restricting the flow of stolen goods.

99.     Rather than directly regulating the *conduct* of the purchase of stolen goods, or requiring registration of those who buy a significant amount of gold and silver, Defendants' enforcement policies suppress protected commercial speech by (1) prohibiting protected speech without a license; and (2) imposing formidable burdens only upon businesses and individuals who engage in protected speech

100.    Pursuant to Defendants' policies, purchasers of valuables that are not subject to the Act, such as gold and silver coins, hallmark bars, ingots, and numismatics, are, absent the acquisition of a license and submission to its significant burdens, prohibited from truthfully advertising their interest in purchasing these products.

---

[23]     *Fla. Bar v. Went For It, Inc.,* 515 U.S. 618, 624, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995); *see also Thompson v. W. States Med. Ctr.,* 535 U.S. 357, 367, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002).

101.     Consequently, an Ohioan who deals in precious metals is forbidden from speaking on behalf of his business unless he acquires a license.  And when such an Ohioan speaks on behalf of his business without a license, he is subject to criminal sanction - - engaging in such speech is a misdemeanor of the first degree, punishable by imprisonment.[24]

102.     Thus, Ohioans who buy, sell, and trade gold and silver, in whatever form, are forced to choose between the options of (1) remaining silent regarding their business activity; (2) acquiring a license and adhering to its substantial burdens in order to engage in protected speech; and (3) prison.

103.     Finally, the Ohio Precious Metals Dealer Act, as written and enforced, burdens, suppresses, and prohibits speech advertising for transactions that do not require any licensure at all.   Put another way, the Act burdens speech by requiring licensure in response to it, even if that speech proposes a transaction that is *exempt* from the Act.

104.     The Department of Commerce and Ms. McCartney's position is that Plaintiffs and others can be sanctioned for advertising to purchase exempt items that constitute a majority of their businesses, just because that advertisement could also be read to include items that are not exempt.

105.     Defendants, through their action and conduct pursuant to the Ohio Precious Metals Dealers Act, have infringed and continue to threaten the First Amendment rights of the Plaintiffs.

106.     The regulation and infringement of the Plaintiffs' First Amendment rights, through the Defendants' conduct and the Ohio Precious Metals Dealers Act, lacks a substantial government interest to support such regulation and infringement, any such putative interest is not directly or materially advanced by such regulation and infringement, and such regulation and infringement is narrowly drawn.

107.     Furthermore, the regulation and infringement of the Plaintiffs' First Amendment rights is based upon the content of the Plaintiffs' speech.

108.     Defendants may not, in response to Plaintiffs' protected speech, shift the burden to Plaintiffs to engage in burdensome proceedings to prove that they are "exempt" from the PMDA.

---

[24]     R.C. 4728.99.

109.     As a result of Defendants' threats, Mr. Tomaso stopped all advertising for Liberty Coins in September 2012.    Shortly thereafter, also in response to Defendants' threats, Mr. Tomaso stopped all purchases of gold and silver items.    Today, Liberty Coins operates in a state of paralysis, subject to unlawful criminal sanction if it continues to speak, subject to unlawful warrantless intrusions if it obtains a license, and subject to destruction of its business if it does neither.

110.     As a result of Defendants' threats, Plaintiff Worthington Jewelers also curtailed its speech.

**COUNT II**
**VIOLATION OF THE RIGHT TO DUE PROCESS**
**UNDER THE FIRST AND FOURTEENTH AMENDMENTS**
**TO THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**

111.     Plaintiffs hereby incorporate by reference the allegations in the foregoing paragraphs as if set forth fully herein.

112.     Under the Act, the standards for whether the business can obtain a license, and thus continue to lawfully advertise, are entirely dependent on a burdensome, nebulous, vague, and arbitrary application procedure.

113.     As an initial matter, "because unfettered governmental discretion over the licensing of free expression 'constitutes a prior restraint and may result in censorship,' a plaintiff may bring facial challenges to statutes granting such discretion 'even if the discretion and power are never actually abused.'"[25]

114.     "When a law predicates expressive activity on the prior acquisition of a permit, the law must contain narrow and precise standards to control the discretion of the permitting authority."[26]    To avoid violating free expression, courts have required that a permitting scheme leave relatively little discretion in the hands of public officials regarding whether to grant a permit.[27]

---

[25]     *Lakewood v. Plain Dealer Pub. Co*., 486 U.S. 750, 755–56, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *Miller v. City of Cincinnati*, 622 F.3d 524, 532 (6th Cir.2010).

[26]     *Parks v. Finan*, 385 F.3d 694, 699 (6th Cir. 2004) (citing *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992).

[27]     *See FW/PBS, Inc.*, 493 U.S. at 225-26, (1990).

115.    The void-for-vagueness doctrine not only ensures that laws provide "fair warning" of proscribed conduct, but it also protects citizens against the impermissible delegation of basic policy matters "for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."[28]

116.    Without "clear standards guiding the discretion of public officials" with enforcement authority, there is a risk that those officials will "administer the policy based on impermissible factors."[29]

117.    The standards R.C. 4728 requires Plaintiffs to adhere to before they may be eligible to operate their businesses and engage in protected speech are vague and invite arbitrary bureaucratic discretion.

118.    Pursuant to R.C. 4728.03, one who buys and sells gold and silver must be "of good character, hav[e] experience and fitness in the capacity involved, [and] demonstrates a net worth of at least ten thousand dollars and the ability to maintain that net worth during the licensure period."[30]  An applicant is further judged by his "reputation" and "ability to maintain net worth during the licensure period." [31]

119.    In their discovery responses, Defendants refused to clarify these terms.

120.    Defendants' enforcement policies have demonstrated the vagueness of these terms, alongside the risk of danger associated with these terms.

121.    Paragraph J of the Settlement Agreement indicates "Because Applicant violated R.C. 4728.02(A), [Defendants] could have found that Applicant does not satisfy the good character requirement for licensure set forth in R.C. 4728.03(B)(1) and the application [sic] have been denied."

122.    Paragraph 5 of the WJ's "Agreed Conditions" further indicates that if WJ did not pay $12,500 to Defendants, Defendants maintained the option of denying WJ's PMDA application.

---

[28]    *UFCW*, 163 F.3d at 358–59 (citing *Grayned*, 408 U.S. at 108–109, 92 S.Ct. 2294).

[29]    *UFCW*, 163 F.3d at 358–59.

[30]    R.C. 4728.03(B)(1).  Notably, the Ohio Administrative Code does nothing to clarify these standards.  Nor does R.C. 4728.03(A), which merely states as follows:  "As used in this section, 'experience and fitness in the capacity involved' means that the applicant for a precious metals dealer's license has had sufficient financial responsibility, reputation, and experience in the business of precious metals dealer, or a related business, to act as a precious metals dealer in compliance with this chapter.

[31]    R.C. 4728.03(C).

123.     Defendants used the ambiguity of the "good character" requirement in R.C. 4728.03(B)(1) to coerce WJ into, amongst other things, paying Defendants $12,500.

124.     Defendants' correspondence to Plaintiff Liberty Coins indicates "[i]f you fail to respond to this letter, the Division may issue a cease and desist order that imposes a fine of up to $10,000," and "continued violation of the PMDA may reflect negatively upon the good character and fitness the division must find in order to issue a PMDA license to your business."[32]

125.     Defendants' interpretation of the "good character" requirement demonstrates its vagueness, insofar as Defendants maintain that it is a character failing for a business to have failed to obtain a license that Defendants never previously made them aware of or enforced.

126.     Each of the aforementioned criteria in R.C. 4728.03 is impermissibly vague and arbitrary.

<u>COUNT III</u>
**VIOLATION OF RIGHT TO BE FREE FROM UNLAWFUL SEARCH AND SEIZURE UNDER THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)**

127.     Plaintiffs hereby incorporate by reference the allegations in the foregoing paragraphs as if set forth fully herein.

128.     The Fourth Amendment protects the right of the people to be secure in their "persons, houses, papers, and effects" against unreasonable searches and seizures.

129.     A search occurs for Fourth Amendment purposes when the government physically intrudes upon one of these enumerated areas, or invades a protected privacy interest, for the purpose of obtaining information. *United States v. Jones,* —— U.S. ——, 132 S.Ct. 945, 949–51 (2012); *Katz v. United States,* 389 U.S. 347, 360–61 (1967) (Harlan, J., concurring).

130.     An enforcement agent or police officer's non-consensual inspection of Plaintiffs' business records plainly constitutes a "search" under either the property-based approach of *Jones* or the privacy-based approach of *Katz.*

---

[32]     Id.

131. The "papers" protected by the Fourth Amendment include business records like those at issue here. *See Hale v. Henkel,* 201 U.S. 43, 76–77 (1906).

132. So long as a business's records are "private," as the Court held in *Hale,* 201 U.S. at 76, 26 S.Ct. 370, they fall within the scope of the "papers" protected by the Fourth Amendment.

133. In *See v. City of Seattle,*[33] the Supreme Court held that, like the search of a private home, the search of a business is presumptively unreasonable if conducted without a warrant, as a businessman's Fourth Amendment guarantees are "placed in jeopardy if the decision to enter and inspect for violation of regulatory laws can be made and enforced by the inspector in the field without official authority evidenced by a warrant." [34]

134. Indeed, [i]t is untenable that the ban on warrantless searches was not intended to shield places of business as well as of residence."[35]

135. Further, employers have a recognizable privacy interest in the records in question, even though the employer is required by law to keep them. [36]

136. Plaintiffs' industry is not a "closely regulated" industry.

137. Even if Plaintiffs' industry were a closely regulated industry, under *Burger* and its progeny, the Fourth Amendment requires that the employer have some notice and opportunity to be heard to challenge the reasonableness of the agency request: while an "agency has the right to conduct all reasonable inspections of such documents which are contemplated by statute,... *it must delimit the confines of a search by designating the needed documents in a formal subpoena.*" [37]

138. Further, a provision authorizing warrantless administrative inspections "devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field...."[38]

---

[33]    387 U.S. 541 (1967)
[34]    *Id.* at 543, 87 S.Ct. at 1739.
[35]    *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312 (1978).
[36]    *Brock v. Emerson Electric Co.,* 834 F.2d 994 (11th Cir.1987).
[37]    Id.
[38]    *Barlow's,* 436 U.S. at 323, 98 S.Ct. at 1826.

Safeguards must be "geared to evaluating the reasonableness of the inspector's decisions prior to his acting on them" and such an "evaluation should take place prior to any search or citation issued for refusal of a search" [because] "[a]n employer may not be threatened with a penalty for asserting his Fourth Amendment rights." [39]

139.    OAC 1301:8-6-03(D), governing precious metals dealers, disbands with all constitutionally-required safeguards by permitting inspection of all  business records at any time for any reason without warrant or even subpoena: "Inspection of books and records: All books, forms, and records, and all other sources of information with regard to the business of the licensee, shall at all times be available for inspection by the division for the purpose of assuring that the business of the licensee is being transacted in accordance with law. * * * All books, forms, records, etc., shall be kept at the licensed location."

140.    Key provisions in R.C. 4728.05-4728.07, including but not limited to R.C. 4728.05(B) and (C) (broad discretion to subpoena attendance and a broad array of records, without probable cause or a warrant; suspension of the license of business owners who do not comply with such subpoenas); R.C. 4728.06 (books at records open to inspection "at all times at the licensed location," and "upon demand"); and R.C. 4728.07 ("each licensed person * * * shall every business day, make available * * * a description of all articles received * * *.") similarly fail to abide by the constitutionally-required safeguards.

141.    Defendants have testified that the above Revised Code and Administrative Code provisions command that "the precious metal dealer needs to report to the police ever day their purchases of precious metal."  See testimony of Brian Landis, Preliminary Injunction hearing transcript, p. 80.

142.    Defendants have further ordered Plaintiffs to "produce business records" so as to "enable the Division to determine a fine amount consistent with settlements made for similar violations of the law."

143.    Defendants' policy of ordering Plaintiffs and other businesses to "produce business records" so as to "enable the Division to determine a fine amount consistent with settlements made for similar violations of the law," is subject to Fourth Amendment scrutiny.

---

[39]    *Emerson*, 834 F.2d at 997.

144. To regain the right to advertise and purchase inventory essential to their business, Plaintiffs must submit to a licensure scheme that features the above unconstitutional searches and seizures.

145. PMDA record inspections involve both a physical intrusion upon a Plaintiffs' papers and an invasion of the Plaintiffs' protected privacy interest in those papers.

146. Plaintiffs' business records are their private property, and the Plaintiffs therefore have both a possessory and an ownership interest in the records.

147. By virtue of those property-based interests, Plaintiffs have the right to exclude others from prying into the contents of its records, which is also the source of its expectation of privacy in the records. *Florida v. Jardines,* ——— U.S. ———, 133 S.Ct. 1409, 1418–19 (2013) (Kagan, J., concurring).

148. Plaintiffs' expectation of privacy is one society deems reasonable because businesses do not ordinarily disclose, and are not expected to disclose, the kind of commercially sensitive information contained in the records—e.g., customer lists, pricing practices, etc.

149. Plaintiffs retain their expectation of privacy in their records notwithstanding the fact that the records are required to be kept by law. *See McLaughlin v. Kings Island, Div. of Taft Broad. Co.,* 849 F.2d 990, 995–96 (6th Cir.1988); *Brock v. Emerson Elec. Co.,* 834 F.2d 994, 996 (11th Cir.1987).

150. Plaintiffs' property and privacy interests are more than sufficient to trigger Fourth Amendment protection.

151. Defendants' inspections involve both a physical intrusion upon private papers and an invasion of the Plaintiffs' protected privacy interest in those papers for the purpose of obtaining information. *See Jones,* 132 S.Ct. at 951 n. 5.

152. Searches for evidence of crime typically require a warrant, and without a warrant, are "presumptively unconstitutional".

153. Even if viewed as an *administrative* inspective scheme, the Supreme Court has made clear that, to be reasonable, such a scheme must at a minimum afford an opportunity for pre-compliance judicial

review, an element entirely lacking in Defendants' policies, including but not limited to R.C. 4728.05-4728.07 and OAC 1301:8-6-03(D).

154.    Government may ordinarily compel the inspection of business records only through an inspection demand "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *See,* 387 U.S. at 544, and the demand to inspect "may not be made and enforced by the inspector in the field." *Id.* at 544–45.

155.    The party subject to the demand must be afforded an opportunity to "obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply." *Id.* at 545.

156.    Defendants' search policies lack the essential procedural safeguard against arbitrary or abusive inspection demands, in part because, these policies provide no opportunity for pre-compliance judicial review of an officer's demand to inspect records.

157.    Refusal of a PMDA search demand, by operation of law, results in criminal and civil penalties.

158.    Plaintiffs, if licensed under the PMDA, become subject to the "unbridled discretion" of officers in the field, who are free to choose, *inter alia*, whom to inspect, when to inspect, and the frequency with which those inspections occur. *See Barlow's,* 436 U.S. at 323.

159.    Because this procedural deficiency affects the validity of all searches authorized by Defendants' policies, the Ohio Revised Code, and the Ohio Administrative Code, there are no circumstances in which the record-inspection provision may be constitutionally applied. *See United States v. Salerno,* 481 U.S. 739, 745 (1987).

160.    Either facial or as-applied invalidation of the relevant Sections is therefore appropriate. *See Barlow's,* 436 U.S. at 325; *Kings Island,* 849 F.2d at 997.

## COUNT IV
### VIOLATION OF RIGHT TO BE FREE FROM EXCESSIVE FINES UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AND RIGHTS TO DUE PROCESS AND EQUAL PROTECTION PURSUANT TO THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)

161.     Plaintiffs hereby incorporate by reference the allegations in the foregoing paragraphs as if set forth fully herein.

162.     The Excessive Fines Clause thus "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'"[40]

163.     Where a civil fine levied by the government is designed to be *at least partially* punitive, it is subject to the excessive fine clause.[41]

164.     While this Amendment usually applies to criminal fines, it also reaches those civil fines designed at least in part to punish.[42]  If a civil fine is subject to the Excessive Fines Clause, courts must examine the proportionality between the fine and the gravity of the associated offense in order to determine whether it is constitutionally excessive.[43]

165.     "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."[44]  A punitive forfeiture violates the Excessive Fines Clause "if it is grossly disproportional to the gravity of a defendant's offense."[45]

---

[40]     *Austin v. United States,* 509 U.S. 602, 609-610, 113 S.Ct. 2801, 2805, 125 L.Ed.2d 488 (1993) (emphasis deleted).

[41]     *Austin v. United States*, 509 U.S. 602, 113 s.Ct. 2801 (1993) ("In considering [whether the excessive fine clause applies], we are mindful of the fact that sanctions frequently serve more than one purpose.  We need not exclude the possibility that a forfeiture serves remedial purposes to conclude that tit is subject to the limitations of the Excessive Fines Clause.").

[42]     *See Austin,* 509 U.S. at 610, 113 S.Ct. 2801; *Korangy v. U.S. F.D.A.,* 498 F.3d 272, 277 (4th Cir.2007); *Thomas v. Commissioner,* 62 F.3d 97, 99 (4th Cir.1995).

[43]     *See Bajakajian,* 524 U.S. at 333-34, 118 S.Ct. 2028.

[44]     *U.S. v. Bajakajian,* 524 U.S. 321, 118 S.Ct. 2028.

[45]     Id.

166. "Excessive" means surpassing the usual, the proper, or a normal measure of proportion.[46]

167. Even a small fine can be punitive. In *Wenhoff,* the court held that a $16 per month late payment penalty was "clearly meant to punish," subjecting it to the Excessive Fines Clause.[47]

168. Federal courts have applied the Excessive Fines Clause to state and local impositions.

169. Defendants maintain a policy of insisting on extracting a fine from precious metal dealers as a pre-condition to obtaining a PMDA license.

170. Defendants maintain that fines are imposed for punitive purposes.

171. Defendants have revealed, in this case, that they force precious metal dealers to pay a financial penalty that is determined on those dealers individual business profits and sales, before they may obtain the PMDA license

172. Defendants have testified as follows: "Q: Is it your position that that fine amount, whatever it ends up being, has to be paid before a business can obtain the precious metal dealers license if they didn't have it before? A: Yes. The violation has to be cured before they can obtain a license,[48] [and in determining the amount of the fine,] I will look at tax returns. I will look at -- more specifically, I like to look at their Schedule C to see what type of profit the business has brought in."[49]

173. Documentary evidence further confirms this differential treatment of precious metals dealers.

174. In essence, in an industry with no licensees prior to ramped-up enforcement, the Department of Commerce has set *de facto* licensing fees that differ as a function of business profit.

175. Businesses forced to apply for and obtain a PMDA license will first be forced to pay a considerable fine based upon their profitability alone.

---

[46]    Id., citing See 1 N. Webster, American Dictionary of the English Language (1828) (defining excessive as "beyond the common measure or proportion"); S. Johnson, A Dictionary of the English Language 680 (4th ed. 1773) ("[b]eyond the common proportion").
[47]    *Wemhoff*, 591 F.Supp, at 809.
[48]    Preliminary Injunction Hearing Tr., at p. 12.
[49]    Preliminary Injunction Hearing Tr., at p. 11.

176.	There is no rational basis, much less a more compelling governmental interest, for fining businesses based solely upon their profits, and that the Department of Commerce's largely unwritten fine policies, patterns, and practices exceed the outer limits of government authority, both on their face and as applied to the Plaintiffs.

177.	Defendants initially demanded $150,000 from WJ as a fine for purchasing precious metals and holding itself out as willing to purchase precious metals without previously holding a PMDA license.

178.	Defendants initially demanded $150,000 from WJ as a condition precedent to its receipt of a PMDA license.

179.	As a result of Defendants' aforesaid policies, Defendants fined Plaintiff Worthington Jewelers $12,500.00, while other precious metal dealers were fined as little as $250.00.

180.	Defendants' correspondence to Plaintiff Liberty Coins indicates "[i]f you fail to respond to this letter, the Division may issue a cease and desist order that imposes a fine of up to $10,000," while elsewhere, Defendants claim that "each violation" of the PMDA carries a $10,000 fine.

181.	Plaintiffs Liberty Coins and Worthington Jewelers face imminent risk of an exorbitant fine, whether to obtain a PMDA license or otherwise.

182.	Defendants' fine polices result in unconstitutionally excessive fines, including the fine issued to and paid by Worthington Jewelers.

183.	Plaintiff Worthington Jewelers is entitled to restitution, so the extent that Defendants' fine violates Plaintiffs' Fifth, Eighth, and Fourteenth Amendment rights.

184.	Plaintiffs hereby incorporate all prior filings in this case, as if attached hereto, including all attachments to Plaintiffs' original Complaint and all evidence otherwise submitted by Plaintiffs and Defendants.

185.	As a proximate result of Defendants' policies, practices, and actions, including not only the Act itself, but also Defendants' written and oral communications and orders to Plaintiffs, Plaintiffs have been irreparably injured, are threatened with further irreparable injury, and will continue in the future to be

irreparably injured, in that they have been and will be deprived of their right to free speech under the First and Fourteenth Amendments to the Constitution, and are threatened with deprivation of their Fourth, Fifth, Eighth, and Fourteenth Amendment rights, should they seek to redeem their First Amendment rights through licensure.

186.    As a legal consequence of the Defendants' violation and threatened violation of Plaintiffs' rights, as alleged above, Plaintiffs are entitled to injunctive relief, equitable relief, and to recover restitution and nominal damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants and that the Court:

(1) Declare that Defendants' imposition of the burdens of obtaining and maintaining a license under Chapter 4728 of the Ohio Revised Code, in response to protected commercial speech proposing transactions that are exempt under the PMDA are unconstitutional as applied to Plaintiffs because they violate the rights to freedom of speech and due process of law guaranteed under the First and Fourteenth Amendments to the Constitution;

(2) Declare that Defendant's threats against Plaintiffs impaired Plaintiffs' First Amendment rights, insofar as it caused Plaintiffs to reasonably restrict their constitutionally-protected speech.

(3) Declare that the inspection, search and seizure provisions in OAC 1301 and R.C. 4728 and in Defendant's less formal practices, authorizing warrantless searches without probable cause are unconstitutional on their face and as-applied to Plaintiffs, both nominally and as an unconstitutional condition of obtaining a PMDA license;

(4) Declare that the licensing criteria in R.C. 4728.03, whether on their face or as-applied by Defendants, are unconstitutionally vague.

(5) Declare that Defendants' practice of imposing fines on precious metal dealers, as a function of those dealers' profits and sales, violates Plaintiffs' Due Process and Equal Protection rights, and results in excessive fines in violation of Plaintiffs' Eighth Amendment rights.

(6) Issue a preliminary and permanent injunction against the Defendants prohibiting the enforcement of said policies against Plaintiffs and others who seek to participate in expressive activities and operate their businesses without submission to unlawful searches, seizures, inspections, and fines;

(7) Award Plaintiffs nominal damages and restitution against Defendants;

(8) Pursuant to 42 U.S.C. §1988 and other applicable law, award Plaintiffs their costs and expenses incurred in bringing this action, including their reasonable attorneys' fees; and

(9) Grant such other and further relief as the Court deems equitable, just, and proper.

Respectfully submitted,

*/s/   Maurice A. Thompson*
Maurice A. Thompson (0078548)
1851 Center for Constitutional Law
208 E. State Street
Columbus, Ohio 43215
Tel: (614) 340-9817
Fax: (614) 365-9564
mthompson@ohioconstitution.org

Curt C. Hartman (0064242)
The Law Firm of Curt C. Hartman
3749 Fox Point Court
Amelia, Ohio 45102
Tel: (513) 752-8800
hartmanlawfirm@fuse.net

## DECLARATION

Pursuant to 28 U.S.C. S I746, I, John Michael Tomaso, Jr., declare the following:

1. I have personal knowledge of the matters alleged in the foregoing Verified Complaint.

2. The allegations contained therein are true and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of January, 2014.

/s/ _John Michael Tomaso_
John Michael Tomaso Jr.
(by counsel, with consent and
approval)